No. ______

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

**IN RE STATE OF MARYLAND,**

*Petitioner.*

On Petition for a Writ of Mandamus
to the United States District Court for the District of Columbia
(Richard J. Leon, District Judge)

# PETITION FOR WRIT OF MANDAMUS

BRIAN E. FROSH
Attorney General of Maryland

LINDA M. STROZYK DEVUONO
Assistant Attorney General
100 S. Charles Street, Tower II,
Suite 700
Baltimore, Maryland 21201
Telephone: (410) 451-3722

ALBERT M. FERLO
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6262

May 12, 2017

Attorneys for Petitioner

## CERTIFICATE AS TO PARTIES

The parties in the district court proceeding, Case No. 14-1471, are as follows:

The Plaintiffs are Friends of the Capital Crescent Trail, John McKnight Fitzgerald and Christine Real de Azua.

Defendants are the Federal Transit Administration, the United States Department of Transportation, the United States Fish and Wildlife Service and the United States Department of the Interior.

The Defendant-Intervenor is the State of Maryland.

The amici curiae in this proceeding are Prince George's County, Maryland, and Montgomery County, Maryland.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES ..... i

TABLE OF AUTHORITIES ..... iii

RELIEF SOUGHT ..... 1

ISSUE PRESENTED ..... 1

INTRODUCTION ..... 2

STATEMENT OF FACTS ..... 5

REASONS WHY THE WRIT SHOULD ISSUE ..... 12

A Supervisory Writ of Mandamus Is Appropriate to Remedy the District Court's Failure to Issue a Final Judgment in this Case ..... 13

- A. There Are No Other Adequate Means to Attain the Desired Relief ..... 14
- B. The State's Entitlement to the Writ Is Clear and Indisputable ..... 17
- C. A Writ of Mandamus Is Appropriate Under the Circumstances ..... 20

CONCLUSION ..... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 17, 18

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
542 U.S. 367 (2004) .......... 14, 20

*Dietz v. Bouldin*,
136 S. Ct. 1885 (2016) .......... 17, 20

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014) .......... 21

*In re United States*,
598 F.2d 233 (D.C. Cir. 1979) .......... 13

*Izaak Walton League of America v. Kimbell*,
558 F.3d 751 (8th Cir. 2009) .......... 16

*Lakes Pilots Ass'n, Inc. v. U.S. Coast Guard*,
359 F.3d 624 (D.C. Cir. 2004) .......... 15

*Life & Fire Ins. Co. of N.Y. v. Wilson's Heirs*,
33 U.S. 291 (1834) .......... 14

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 18

*N.C. Fisheries Ass'n v. Gutierrez*,
550 F.3d 16 (D.C. Cir. 2008) .......... 14, 15

*Occidental Petroleum Corp. v. SEC*,
873 F.2d 325 (D.C. Cir. 1989) .......... 15

*Rempfer v. Sharfstein*,
583 F.3d 860 (D.C. Cir. 2009) .......... 18

*Roche v. Evaporated Milk Ass'n*,
319 U.S. 21 (1943) .......... 13

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) ........ 19

*Sierra Club v. U.S. Dep't of Agriculture*,
716 F.3d 653 (D.C. Cir. 2013) ........ 15, 16

*Spencer v. Kemna*,
523 U.S. 1 (1998) ........ 13

*U.S. v. Fokker Services B.V.*,
818 F.3d 733 (D.C. Cir. 2016) ........ 14

*Will v. Calvert Fire Ins. Co.*,
437 U.S. 655 (1978) ........ 13

**STATUTES**

28 U.S.C. § 1291 ........ 14

28 U.S.C. § 1292(a)(1) ........ 16

28 U.S.C. § 1651 ........ 1

**OTHER AUTHORITIES**

Fed. R. App. P. 21 ........ 1

Fed. R. Civ. P. 1 ........ 17, 18, 24

Fed. R. Civ. P. 56 ........ 17, 18

Fed. R. Civ. P. 56(a) ........ 17, 18

Fed. R. Civ. P. 56(c) ........ 18

## PETITION FOR WRIT OF MANDAMUS

### RELIEF SOUGHT

Pursuant to 28 U.S.C. § 1651 and Federal Rule of Appellate Procedure 21, the State of Maryland (the "State") respectfully petitions this Court to issue a writ of mandamus in aid of its appellate jurisdiction, directing the United States District Court for the District of Columbia to decide forthwith the dispositive cross-motions for summary judgment now pending in the case below, *Friends of the Capital Crescent Trail, et al. v. Federal Transit Administration, et al.*, No. 14-1471.

### ISSUE PRESENTED

In this challenge to federal administrative agency action involving a vital State-sponsored transportation project with federal funding, should this Court exercise its discretion to issue a writ of mandamus directing the district court to decide dispositive cross-motions that have been fully briefed and pending decision for nearly a year, where there are no disputed facts and the district court's continued delay threatens to cause the State and its taxpayers a loss of over $800 million in addition to the transportation project itself?

## INTRODUCTION

A writ of mandamus is an extraordinary remedy that this Court does not lightly grant. However, the facts underlying the State's request are extraordinary. By June 1, 2017, without the relief sought from this Court, budgetary requirements will force the State to begin suspension of work on a multi-billion dollar project. The suspension will in turn result in significant increases in the cost of the project and eventually could lead to the cancellation of the project, which would deprive the State of a vitally needed transportation facility and cause the irretrievable loss of over $800 million. *See* Declaration of Pete K. Rahn, Secretary of the Maryland Department of Transportation ("Rahn Decl.") ¶ 74. The Rahn Declaration is attached to this Petition as Exhibit A.

The project in question is known as the Purple Line, a 16-mile long transit facility designed to serve residents in a corridor that spans from Bethesda, in Montgomery County, to New Carrollton, in Prince George's County. The Purple Line ("Purple Line" or the "Project") has been in the planning and approval process for well over a decade. It is supported by virtually all of the local jurisdictions along the line, including the governments of Montgomery and Prince George's Counties. Rahn Decl. ¶ 9.

This case began in August 2014 when an organization and two individual plaintiffs sued the Federal Transit Administration ("FTA"), the U.S. Department of Transportation, and two other federal agencies. The State intervened, in part to ensure that the district court would understand that any delay in this litigation would jeopardize the Project and impose great financial cost on the State. ECF 18-1 at 8-9. Summary judgment motions have been pending and fully briefed since June 2016. Although the district court did issue an order on August 3, 2016 addressing and granting partial summary judgment on a single issue, the court reserved judgment and did not address the 23 other issues in the case. The State recognizes that, in other circumstances, nearly a year's delay in the issuance of a decision on fully-briefed issues might not be deemed unreasonable or a cause for concern. However, as more fully explained below, from the time of the first status conference in July 2015, the district court's handling of this case has created an extraordinary circumstance that risks the ongoing viability of the Project, and so compels the State to file this petition.

The prejudice caused by the delay in resolving the cross-motions for summary judgment primarily arises from the district court's August 3, 2016 Order vacating the FTA's Record of Decision ("ROD") approving the Purple Line for federal funding. In the absence of the ROD, federal funding that is necessary for the Project to continue is unavailable. The August 3 Order vacated the ROD

because of the district court's belief that more analysis was needed on the impact of recent ridership declines and safety issues on the Washington Metrorail system, but the court gave no indication of when the other 23 issues would be decided. Nine months later, the district court has not yet decided any of those issues, nor has it finally decided whether to uphold FTA's determination in response to the August 3 Order that no further environmental analysis is required. In the absence of a final decision, and with the FTA's ROD vacated, the State lacks an appealable final order from the district court, yet also lacks the ability to proceed with construction of the Purple Line. With each passing month, the continued delay costs the State millions of dollars and places the Project in greater jeopardy.

By limiting its decision to only one of 24 issues raised in the case, and by continuing to ignore Defendants' resolution of the single issue previously decided, the district court has brought this Project to the brink of cancellation. If the Project is canceled due to the district court's delay, that would deprive the State of the ability to seek meaningful appellate review and deprive this Court of an opportunity to conduct the requisite *de novo* review of the merits of Plaintiffs' claims in a timeframe that would allow the Project to continue if Defendants are successful on appeal.

Because the State lacks any means to seek timely appellate review of the district court's action, and given the extraordinary harm that the State is currently

suffering and will suffer absent a prompt final decision on the merits by the district court, the State has reluctantly taken this extraordinary step of invoking this Court's supervisory mandamus jurisdiction.

## STATEMENT OF FACTS

Following a lengthy and thorough analysis of environmental impacts as required by the National Environmental Policy Act ("NEPA"), FTA issued its ROD approving the Purple Line Project on March 19, 2014. On August 26, 2014, Plaintiffs filed their initial complaint against the federal Defendants. ECF 1. However, Plaintiffs did not complete service of the complaint on all federal defendants until December 16, 2014. ECF 12. The State moved to intervene as a defendant on March 10, 2015, noting its "strong interest in the swift resolution of the case." ECF 18-1 at 12. On April 9, 2015, Plaintiffs filed an amended complaint. ECF 20. The federal Defendants filed an answer to the amended complaint on April 23, 2015 (ECF 22), and filed the administrative record by June 2, 2015 (ECF 24, 25).

On July 15, 2015, the district court held a status conference where it granted the State's motion to intervene and directed the parties to develop a proposed summary judgment briefing schedule. In response to the State's request that the district court rule expeditiously, the district court stated that it was not likely that it would be able to consider the case until the Spring of 2016, and that the parties

should develop a briefing schedule reflecting that timeframe. July 15, 2015 Transcript ("Status Conf. Tr.") at 15.[1] The district court noted that this timeline could have "a little bit of a delaying effect, but, you know, not that much." *Id.* at 22.

When the State informed the district court that the proposed timeframe "could kill the project . . .," the district court admonished the State "not [to] have a doomsday attitude about it." *Id.* The district court then said that it had "no reason to think contractors are going to be dissuaded if it might start a month or two later. It's just not likely." *Id.* at 23. In dismissing the State's concern that a delayed final decision could affect the Project's financing, the district court stated that the potential bidders were "awash in money. Don't worry about it." *Id.*

Shortly after the July 15, 2015 status conference, Plaintiffs filed the first of its two "supplemental complaints." ECF 32. Plaintiffs then filed a second supplemental complaint on January 20, 2016. ECF 42. In allowing Plaintiffs' second supplemental complaint, the district court established a summary judgment briefing schedule. Pursuant to that schedule, the parties filed cross-motions for summary judgment, and briefing on those motions was completed on May 24, 2016. The district court held a hearing on the summary judgment motions on June 15, 2016. At the hearing, the State again advised the district court that a delay in

---

[1] A copy of the transcript of the July 15, 2015 status conference is attached as Exhibit B.

the project would cost the State millions of dollars. June 15, 2016 Transcript ("Summary Judgment Tr.") at 78.[2] The State also informed the court that the private parties who had won the right to build and operate the transit line had succeeded in obtaining the financing they needed to implement the project – so that all financing needed for construction was in place except for the FTA's $900 million grant. *Id.* at 50.

During the hearing, the district court and Plaintiffs' counsel engaged in a dialogue about the delay that might be occasioned if the court ordered Defendants to prepare a supplemental Environmental Impact Statement ("EIS") on a single issue raised in Plaintiffs' summary judgment motion, and whether such a ruling would be appealable. *Id.* at 55-60. Plaintiffs' counsel suggested that the agency could complete the document "within six months," *id.* at 55, and, in response to a question from the court, questioned whether such an order would be appealable, *id.* at 59-60. Plaintiffs' counsel further stated that it would not make sense for the government to appeal from such an order in any case "because the D.C. Circuit has its own timetable for doing things." *Id.* at 60.

In response, the State's counsel informed the Court that a six-month delay "would allow the private investors to pull out" of the Project, and if that were to happen, "the state would incur all the costs that [the private investors] have thus far

---

[2] A copy of the June 15, 2016 Transcript is attached as Exhibit C.

incurred. . . ." *Id.* at 77-78. Counsel for FTA also pointed out that the issue the district court was considering for preparation of a Supplemental EIS was based on events that occurred on the Washington Metrorail system after FTA had issued the ROD. *Id.* at 64.

At the district court's request, the parties filed supplemental summary judgment briefs on June 29, 2016. ECF 92, 93, and 94. In its supplemental brief, the State requested that the district court allow additional briefing on possible remedies and noted that the possible schedule and financial impacts of even a short delay in resolving the case would lead to "cascading consequences." ECF 93 at 15.[3]

In late July 2016, the State announced that on August 8, 2016, the Full Funding Grant Agreement ("Grant Agreement") would be signed, providing the State with access to $900 million in vital funding for the project.[4] On August 3, 2016, shortly after the public announcement and five days prior to the scheduled signing, the district court entered an order that has prevented the execution of the

---

[3] A copy of the State's Supplemental Brief is attached as Exhibit D.

[4] *See* Washington Post, July 28, 2016, "Signing of Purple Line's federal funding agreement set for Aug. 8, officials say," available at https://www.washingtonpost.com/news/dr-gridlock/wp/2016/07/28/signing-of-purple-lines-federal-funding-agreement-set-for-aug-8-sources-say/?utm_term=.f4e608c871f1 (last accessed on May 3, 2017).

Grant Agreement. The court order decided only one of the 24 issues raised in Plaintiffs' summary judgment motion. August 3, 2016 Opinion, ECF 96.[5]

On that issue, the court ordered FTA to produce a Supplemental EIS addressing the impact of recent ridership declines and safety issues on the Washington Metro system as "expeditiously as possible." *Id.* at 9. The district court stated that it was a matter of "common sense" to prepare the Supplemental EIS before the FTA committed to providing the funding needed for the project. *Id.* Without allowing an opportunity for briefing on the scope of the remedy for this single issue, the district court vacated FTA's ROD, thus preventing FTA from signing the Grant Agreement and preventing the State from initiating construction of the Project. The district court stated that it would "reserve[]" judgment on the remaining issues in the case, *id.* at 2, and has never returned to them.

On August 23, 2016, the State and FTA filed motions to amend the judgment to allow FTA to determine in the first instance whether the Metro ridership and safety issues warranted preparation of a Supplemental EIS. ECF 98 & 99. In the same motions, the State and FTA also moved the court to reinstate the ROD while this additional analysis was prepared. *Id.* Briefing on the motions was completed on September 19, 2016.

[5] A copy of the district court's August 3, 2016 Opinion is attached as Exhibit E.

On November 22, 2016, the district court granted the motion in part, allowing FTA to make the determination whether a Supplemental EIS was needed on the Metrorail issue, the court declined to reinstate the ROD. November 22, 2016 Order, ECF 110.[6] The district court established a briefing schedule to address FTA's determination, once that decision was made.

On December 16, 2016, FTA informed the district court that it had completed the required analysis and determined that recent ridership and safety issues facing the Washington Metro did not warrant a Supplemental EIS for the Purple Line. FTA filed the analysis and its determination with the district court. ECF 113. That same day, the State and FTA filed renewed motions for summary judgment on all issues. ECF 115 & 116. Plaintiffs responded to the renewed motions for summary judgment on January 5, 2017 (ECF 119), and the State and FTA filed reply briefs on January 12 and 13, 2017, respectively. ECF 120 (State's Reply) & 121 (Federal Defendants' Reply). Since that time, all issues raised in the cross-motions for summary judgment – both in the initial motions and the renewed motions – have been ripe for decision.

On March 31, 2017, the State filed a motion seeking an expeditious ruling on all remaining issues in the summary judgment motions or, in the alternative, an order reinstating the ROD until those motions are decided. State's Motion, ECF

---

[6] A copy of the district court's November 22, 2016 Order is attached as Exhibit F.

133.[7] The State informed the district court that the passage of time is causing "grave harm" to the State and the businesses, counties, and cities that "are relying on the Project to create jobs and to improve access to public and commercial facilities and neighborhoods." State's Reply, ECF 135 at 3.[8] Relying on previously submitted declarations from the State official in charge of the Project,[9] the State reminded the district court that "each month of delay could result in an estimated $13 million in additional cost." *Id.* at 4. The State also reminded the district court that termination of the project as a result of a failure to resolve the litigation could result in termination costs and delay damages that, at that time, would have resulted in a total loss to the State of approximately $650 million. *Id.*

As of the date of the filing of this Petition, the district court has not granted or denied the motion for an expeditious decision, nor has it issued a final appealable order resolving all the issues in the case, nor has it reinstated the ROD in response to FTA's resolution of the only issue on which the court has ruled thus far. The State therefore requests that this Court order the district court to issue a final decision addressing all issues raised in the parties' cross-motions for summary judgment.

---

[7] A copy of the State's Motion is attached as Exhibit G.

[8] A copy of the State's Reply is attached as Exhibit H.

[9] Declaration of Charles Lattuca, ECF 98-3 and Second Declaration of Charles Lattuca, ECF 116-2. Copies are attached as Exhibits I & J.

## REASONS WHY THE WRIT SHOULD ISSUE

The State is now at a critical point in its efforts to maintain the viability of the Project. The district court's order vacating the ROD stands in the way of the State obtaining the federal funds needed to implement the Project, while the district court's unexplained failure to address the other issues in the case deprives the parties of an appealable final judgment. The district court's order requiring FTA to produce a Supplemental EIS was initially intended to preserve the status quo – *i.e.*, no construction activity or federal funding – for a confined period while FTA conducted additional analysis of the effects of Metrorail safety and ridership issued on the Purple Line. That period has long since passed, the required analysis was completed and submitted to the district court in 2016, and yet the State remains unable to move forward with the Project because no final decision has been issued by the district court.

The district court's decision to address only a single issue out of the 24 issues raised in the parties' summary judgment motions, and its subsequent failure to rule on the adequacy of the additional analysis ordered in its August 3 Opinion, leaves the State with an inability to proceed or to appeal, and has created a substantial risk that this dispute will ultimately be decided by pocket veto rather than on the merits. This course has impeded the State's ability to implement this important public transit project and now threatens to force the State to suspend

many of the implementation activities, in an attempt to minimize the damage caused by the district court's limited and interlocutory decision. The citizens of the State are entitled to a decision on all of Plaintiffs' pending claims in a timeframe that allows the State either to implement the Project without further undue delay or to pursue available appellate review and relief from the district court's order.

**A SUPERVISORY WRIT OF MANDAMUS IS APPROPRIATE TO REMEDY THE DISTRICT COURT'S FAILURE TO ISSUE A FINAL JUDGMENT IN THIS CASE.**

A writ of mandamus "has traditionally been used in the federal courts . . . 'to compel [a district court] to exercise its authority when it is its duty to do so.'" *In re United States*, 598 F.2d 233, 236 (D.C. Cir. 1979) (quoting *Roche v. Evaporated Milk Ass'n,* 319 U.S. 21, 26 (1943)). Mandamus relief is appropriate when a district court's failure "to adjudicate a case properly before it" is '"obstructing the appeal'" and might otherwise prevent the appellate court from exercising its jurisdiction. *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 662 (1978) (quoting *Roche*, 319 U.S. at 25). The Supreme Court expects that "as a general matter, district courts . . . will not unduly delay their own rulings," but if that expectation is not met, "where appropriate, corrective mandamus will issue from the courts of appeals." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

Although mandamus is a "drastic and extraordinary" remedy "reserved for really extraordinary causes," the Supreme Court has instructed that the

requirements for granting the writ, "however demanding, are not insuperable." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380, 381 (2004). "Before a court may issue the writ, three conditions must be satisfied: (i) the petitioner must have 'no other adequate means to attain the relief he desires'; (ii) the petitioner must show that his right to the writ is 'clear and indisputable'; and (iii) the court 'in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.'" *U.S. v. Fokker Services B.V.*, 818 F.3d 733, 747 (D.C. Cir. 2016) (granting writ of mandamus against district court (quoting *Cheney*, 542 U.S. at 380–81)). All of these conditions are satisfied here.

### A. There Are No Other Adequate Means to Attain the Desired Relief.

This case satisfies the first condition – the lack of any other adequate avenue to relief – because, as the Supreme Court has long recognized, mandamus "is the only adequate mode of relief, where an inferior tribunal refuses to act upon a subject brought properly before it." *Life & Fire Ins. Co. of N.Y. v. Wilson's Heirs*, 33 U.S. 291, 302–03 (1834). Here, it is clear that there are no other adequate means for the State to attain the desired relief from the August 3, 2016 remand order vacating the ROD.

The State could not seek to appeal the district court's August 3, 2016 remand order, because "[i]t is black letter law that a district court's remand order is not normally 'final' for purposes of appeal under 28 U.S.C. § 1291." *N.C.*

*Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 19 (D.C. Cir. 2008) (citations omitted). Although "there is a limited exception permitting a government agency to appeal [a remand order] immediately rather than bear significant expenses that cannot be recovered or take action pursuant to the remand that cannot be reversed if it is later determined that the order was improper," *id.* (citation omitted), this Court has applied that exception only when "the *agency to which the case is remanded* seeks to appeal . . . ." *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 330 (D.C. Cir. 1989) (emphasis added). Here, the district court's August 3, 2016 order vacated the ROD, and remanded to the federal agency that generated it, FTA, with instructions to prepare a Supplemental EIS. ECF 97. The "limited exception" does not permit the State to appeal under these circumstances.

For similar reasons, the State could not appeal the August 3 Order under the collateral order doctrine. In *Lakes Pilots Ass'n, Inc. v. U.S. Coast Guard*, 359 F.3d 624, 625 (D.C. Cir. 2004), this Court treated the "limited exception" for federal agencies described above as a subset of the collateral order doctrine. The Court held that an interlocutory appeal under the collateral order doctrine was generally unavailable to parties other than the government agency to which the case was remanded. *Id.*; *see Sierra Club v. U.S. Dep't of Agriculture*, 716 F.3d 653, 656-57 (D.C. Cir. 2013) (reaching the same conclusion but addressing separately collateral

order analysis and the "limited exception" authorizing an appeal by the agency to which the case has been remanded).

Finally, the district court's order vacating the ROD is not appealable as an order granting injunctive relief. In *Sierra Club*, this Court held that even where a district court's order included directives enjoining the federal agency to take certain actions on remand, the order will not be treated as an immediately appealable injunction under 28 U.S.C. § 1292(a)(1) if "the injunction against the [federal agency] serves no function beyond the remand order." 716 F.3d at 660 (agency obligated to prepare environmental impact statement on remand). In reaching that conclusion, the Court cited with approval an Eighth Circuit decision holding that "it lacked jurisdiction under § 1292(a)(1) where," as in this case, "a defendant-intervenor, rather than the defendant agency, sought to appeal a district court order enjoining the agency from taking further action until it prepared an EIS." *Id.* (citing *Izaak Walton League of America v. Kimbell*, 558 F.3d 751, 763 (8th Cir. 2009)).

Quite simply, the district court has yet to issue an appealable order or to provide any indication of when it will do so. Continuing delay comes with the substantial risk that the State will be compelled to cancel the Project because of the inability to access $900 million in federal funding and in order to avoid further delay damage claims under the public-private partnership agreement to develop

and implement the Project. It is the lack of appealability of the order vacating the ROD – a matter the district court confirmed with Plaintiffs' counsel before issuing its August 3 Order – that has compelled the State to seek this extraordinary relief. The State has no other adequate means of securing the necessary relief.

**B. The State's Entitlement to the Writ Is Clear and Indisputable.**

The second condition for mandamus is satisfied because the State is "clearly and indisputably" entitled to a timely resolution of the pending cross-motions for summary judgment. The Supreme Court has insisted that all district court procedures in civil actions serve "Rule 1's paramount command: the just, speedy, and inexpensive resolution of disputes." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016); *see* Fed. R. Civ. P. 1 (The Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). The Supreme Court has long held that this "paramount command" of Rule 1, together with the language of Rule 56, imposes on a district court the obligation to decide a summary judgment motion when, as in this case, the submissions before the court establish that "there is no genuine dispute as to any material fact. . . ." Fed. R. Civ. P. 56(a). "Summary judgment procedure," like "the Federal Rules as a whole," is "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting former language of

Fed. R. Civ. P. 1). A summary judgment motion "may, and *should, be granted* so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as [formerly] set forth in Rule 56(c) [now in Rule 56(a)], is satisfied." *Id.* at 323 (emphasis added). "[T]he plain language" of Rule 56 "*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof. . . ." *Id.* at 322 (emphasis added). "Where no such showing is made, '[t]he moving party is '*entitled to a judgment* as a matter of law.''" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (emphasis added).

This obligation to provide a "just, speedy, and inexpensive determination" of a summary judgment motion is all the more imperative, and should be all the more readily achieved, in a case such as this involving review of administrative agency action. For, as the district court acknowledged, it has only a "limited" task. *See* Exhibit D, August 3 Opinion at 2-3 ("The Court's review 'is based on the agency record and *limited* to determining whether the agency acted arbitrarily or capriciously.' *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)." (emphasis added)). Indeed, in this context a summary judgment motion merely "serves as the mechanism for deciding, as a matter of law, whether the agency

action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

Despite the limited and straightforward role of a court on judicial review of administrative action, the district court indefinitely, and without explanation, deferred ruling on 23 of the 24 issues placed before it in the cross-motions for summary judgment. The district court reasoned, in reliance on its own "common sense," that a delay in implementing the Project was warranted, and that a "temporary halt" for the agency to produce a Supplemental EIS on a single issue was a prudent way for the federal government to proceed. Exhibit E, August 3 Opinion at 9. However, the district court never addressed how the "temporary halt" to prepare a new environmental analysis on a single issue would interact with its decision to reserve judgment on the remaining 23 issues in the case. For example, the district court did not indicate if preparing the Supplemental EIS on that single issue, in itself, would resolve the other NEPA claims in the lawsuit. Notably, several of the issues "reserved" by the district court addressed the sufficiency of the underlying original EIS. *See*, *e.g.*, Plaintiffs' Amended Complaint, ECF 20, ¶¶ 122-136. The district court did not indicate if, after FTA had prepared a Supplemental EIS, the court would then grant summary judgment to MTA and FTA on the Plaintiffs' claims that the underlying EIS was inadequate.

Under the district court's decision on partial summary judgment, FTA could have initiated preparation of a Supplemental EIS on the Metrorail issue, published that document for public comment, and issued an updated ROD, only to have the district court find that the underlying EIS was flawed in other ways and then require *another* Supplemental EIS to address those additional issues. The district court's decision to withhold judgment on the remaining 23 issues leaves entirely unclear whether there is a path to resolution or what the timeframe for such a path might be.

In short, by failing to resolve finally the only issue on which it has thus far ruled and reserving judgment indefinitely on all the others, the district court has created a situation in which the State could be left without a "final" judgment indefinitely in this time-sensitive and important matter. Condemning the State to indefinite uncertainty and delay, at enormous expense, deprives Maryland and its taxpayers of the "just, speedy, and inexpensive resolution of disputes," and thereby defies the Rules' "paramount command." *Dietz*, 136 S. Ct. at 1891. Mandamus is the necessary and appropriate remedy.

### C. A Writ of Mandamus Is Appropriate Under the Circumstances.

Finally, "the writ is appropriate under the circumstances" that the State is facing. *Cheney*, 542 U.S. at 381. This third criterion for mandamus has been construed to be "a relatively broad and amorphous totality of the circumstances

consideration." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 762 (D.C. Cir. 2014). Foremost among the pertinent totality of the circumstances is the harm to the State caused by the failure of the district court to issue a final appealable judgment, a failure with costly consequences that could not be corrected by an appeal at a later date.

The State has repeatedly informed the district court that a delay in issuing a decision results in great financial cost to the State – an estimated $13 million for each month of delay – and increases the probability that the Project will need to be abandoned to prevent further financial harm to the State. Even now, the cost to the State of cancellation of the Project has grown to more than $800 million. Exhibit A, Rahn Decl. ¶ 74. This amount includes (1) funds expended to date in development of the Project of approximately $545 million; (2) delay costs, which could reach approximately $150 million for an estimated 12-month delay; and (3) termination costs, which could reach approximately $200 million. *Id.*[10]

As further explained in the Rahn Declaration (Exhibit A at ¶¶ 56-78), these harms to the State are real and substantial. The cascading effects predicted in the State's supplemental brief (ECF 93) filed in June 2016, pose current and future

[10] In anticipation of receiving the $325 million that Congress has already appropriated for this Project, the State has expended that amount using State taxpayer dollars to carry out ongoing and long lead-time pre-construction activities, such as real property acquisitions, engineering and design, soil and geotechnical analysis, utility relocations and community and small business outreach and involvement. Exhibit A, Rahn Decl. ¶ 33.

harm to the Project. Failure to reinstate the ROD would result not only in a tremendous financial loss to the State, but also a tremendous loss to the tens of thousands of workers, students, and other residents of the State who would benefit from a transit line connecting Montgomery and Prince George's Counties.[11] Declarations filed in district court informed that court of the substantial harm to the State absent a final appealable decision. *See* Exhibits I & J, Latucca Declarations, ECF 98-3 & 116-2, respectively.

The harm to the State is not limited to the potential loss of over $800 million. The Project includes the replacement of eight bridges in the Counties – several of which are currently structurally deficient. Major maintenance or replacement work by the Counties on these bridges was put on hold pending implementation of the Project. One bridge was recently closed to vehicular traffic, causing school buses and emergency vehicles to take longer routes to reach their destinations. Exhibit A, Rahn Decl. ¶ 77.

The State anticipates that as of June 1, 2017, it will no longer have sufficient funds to continue funding pre-construction activities. *Id.* at ¶ 62. As a result, if the ROD is not reinstated by that date, the State is likely to direct the private developer to begin an orderly process of suspending Project activities. *Id.* The State will also

---

[11] One of the benefits is quicker trips connecting large population centers in the two Counties. For example, a trip between downtown Bethesda and downtown Silver Spring is projected to take nine minutes. Exhibit A, Rahn Decl., ¶ 17a.

initiate suspension of other activities it is carrying out on its own. *Id.* If Project activities are able to resume in the future, this resumption will result in increased Project costs for remobilization. Moreover, in light of impending deadlines for inclusion in the federal budget, the Secretary expects that suspension of activities now would impair the State's ability to obtain additional federal appropriations for the 2018 Fiscal Year. Even in the event the Project were ultimately able to proceed, a failure to obtain a 2018 appropriation now would cause yet further delays and increased costs for the Project. *Id.* at ¶ 66.

In addition to the direct implications for the Project, because of the expenditure of State funds on pre-construction activities that were expected to be reimbursed by appropriate federal funds, a delay in obtaining federal funding for this Project will also require the State to begin delaying or eliminating other transportation projects from the State's transportation plans to make up the shortfall. *Id.* at ¶ 78.

While the State will continue to take all reasonable steps to avoid cancellation of the project, the Secretary expects that a decision to cancel the Project could occur unless the ROD is reinstated within approximately 60 days following the suspension of ongoing Project activities. *Id.* at ¶ 65. If the Project is terminated before a final decision by the district court, the case could become moot – preventing the State from ever obtaining a final judgment on the merits in the

district court or from appealing an adverse district court decision. Moreover, even if the case were not found to be moot, a favorable ruling in the district court or on appeal would be a hollow victory if it comes only after the Project has been rendered non-viable due to the passage of time. A final decision by the district court in a timeframe that allows the Project to proceed or for expedited consideration by this Court of the merits of Plaintiffs' claims is necessary to avoid the potential of irreparable harm to the State.

As the State argued in its still-pending motion to expedite the district court's decision on the merits, there is a simple reason for the State's request for a final decision: the fate of the Purple Line hangs in the balance, and that fate should be determined by policy makers responsible for the Project and accountable to the public – or, if by a court, on the merits of a claim – rather than as a side-effect of inaction by the district court. Exhibit G. A writ of mandamus from this Court directing the district court to issue a final judgment in this case forthwith is needed to satisfy the "paramount command" of Rule 1 and to ensure that the interests of justice are served.

## CONCLUSION

For the foregoing reasons, the petition for a writ of mandamus should be granted.

Dated: May 12, 2017

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

Linda M. Strozyk DeVuono at

LINDA M. STROZYK DEVUONO (Bar No. 429514)
Assistant Attorney General
100 S. Charles Street, Tower II, Suite 700
Baltimore, MD 21201
(410) 451-3722
Email: ldevuono@sha.state.md.us

ALBERT M. FERLO
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
Email: aferlo@perkinscoie.com

Attorneys for Petitioner

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 21(d)(i) of the Federal Rules of Appellate Procedure. As measured by the word-processing system used to prepare this brief, the brief contains 5,880 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14 point proportionally spaced roman-style typeface (Times New Roman).

Albert M. Ferlo

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2017, a copy of the foregoing Petition for a Writ of Mandamus with accompanying Exhibits was served via U.S. First Class Mail and email on the following counsel of record in the U.S. District Court.

David Brown
Knopf & Brown
brown@knopf-brown.com

Kevin W. McArdle
U.S. Department of Justice
Keven.mcardle@usdoj.gov

Jeremy Hessler
U.S. Department of Justice
Jeremy.hessler@usdoj.gov

Tyler L. Burgess
U.S. Department of Justice
Tyler.burgess@usdoj.gov

John M. Fitzgerald
4502 Elm Street
Chevy Chase, MD 20815
johnmfitzgerald@earthlink.net

Eric Robert Glitzenstein
Meyer Glitzenstein & Eubanks LLP
eglitzenstein@meyerglitz.com

Date: May 12, 2017

Sheri Pais
Sheri Pais